The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. McKina v. Kutlay Kayes. Mr. Ryszkowski, I'm pleased to hear from you. I'm sorry, Your Honor? Whenever you're ready. May it please the Court, my name is John Ryszkowski. Can you move it down just a little bit? Is that better, Your Honor? That's perfect. May it please the Court, my name is John Ryszkowski and I represent the appellant, McKina v. Kimya Endustrisi, or MKE for short. We're here to address what is an unambiguous and express contract in three separate ways, Your Honors. It is a contract that had an express installment contract relating to the delivery of up to four shipments of weapons. It had an express installment contract that separately addressed the payment of a long due debt. Thirteen different installments that were due relating to that debt. And it also had an express provision relating to termination. All of which were followed in this case. Notwithstanding the fact that this was an express and unambiguous contract, MKE submits that the District Court erred in three respects. First of all, the District Court gave three instructions that were not supported by the law or by the facts in this case, considering the clear and unambiguous contract. Second, the District Court erred by not granting MKE's Rule 50 motion in that regard. And third, somewhat in relation to that, Your Honors, as well, we identified some erroneous and prejudicial evidence that also supported or was allowed to help with the wayward jury verdict in this case. Going back to the contract itself, we mentioned at the outset there's three different express parts of it. One part of that was relating to four potential shipments. And the evidence clearly showed that those shipments required a firm schedule. That was something that not only MKE introduced, but Zenith, the defendant, introduced as part of its case to confirm that that firm schedule required a 30%, or I'm sorry, a 40% payment three months in advance. For the first two shipments after the contract was signed, Zenith missed both of those payments. For one of the- So I'll take a step back. It was four months before. My question to you is when was the first shipment after the contract was signed? The first shipment after the contract was signed was March 11th. And when was that? The contract was signed February 7th. Okay. So you couldn't follow the 40 days then. Understood. But, Your Honor, that's – well, let me address those two payments separately, because they really are addressed separately. There were two payments that would have been due before the contract was signed. Nothing stopped Zenith from making those payments before the contract was signed, whether on a purchase order basis or otherwise. But those two payments don't establish a course of conduct or a course of performance, if that's what Your Honor is driving at, Judge Neumeier. No, I'm just – the contract seems to be an integrated contract that connects the payment of the debt to the receipt of monies for the sale of the arms and pistols. In other words, the idea was they would be sold and the proceeds would be used to pay the debt. And so if there was a delay in the shipments, there should be an adjustment in the payment of debts. And that was explicit in the contract. This was all presented to the jury. And the real question is we're not here to decide whether your argument is right or wrong. I think we're deciding was there evidence for the jury to conclude. And you're not even challenging that. You're really – I'm not sure what is before us, because you probably have to start with your Rule 50A motion. And your Rule 50A motion challenged damages. And thereafter, you tried to expand it to other grounds. But I'm not sure that's possible. So let me take a step back, Your Honor, because, first of all, I do want to push back in terms of your comments relating to the contract itself. The contract did not link those two together. And how do we know that? We know that for three reasons, Your Honor. First of all, the contract itself does not link them. And I'll walk through that language. Well, it says – you know, I don't want to get – I really don't want to debate the contract. But I do know the contract says that if the shipment doesn't come – is delayed for various reasons, that the payment schedule will be adjusted. It says that in the contract. It says if there is a shipment delay, there will be a delay in the payment schedule. And that's indicative of some kind of linkage. They're not so independent as you maintain, but quite apart from all of that. You argued this to the jury when the jury ruled against you. Well, Your Honor, but what we're addressing here – and that's why I started with the jury instructions. The jury instructions in this case were incorrect as a matter of law and also insupported by the facts. But, first of all, let me just briefly step back because I do want to address your question or your comment head on. You're correct that it says if there's a shipment delay, that there will also be a consequent delay in the payment schedule. But we need to look at what actually happened here. And that's why those facts don't support the jury instructions in this matter. First of all, in terms of Ms. Kaya, Ms. Kaya was the CEO of the entity Zenith. She admitted at both page 3162 and 3174 of the record that they were not linked. The direct question was asked of her where she kept saying, I wanted to get this, but MKE would not allow it. In other words, she's talking about hopes and dreams and aspirations, not what was actually in the contract. Page 3174, she expressly admitted that those two did not go hand in hand. In direct answer to Your Honor's question, Your Honor, similarly, the fact of if there was an allegation of a shipment delay that fails for two separate reasons, and again, that goes to the heart of the jury instructions and the Rule 50A motion that we submitted relating to damages and relating to the issues that are being brought here. First of all, in terms of the first shipment. Rule 50A motion didn't actually relate to the issues that are being brought here. Isn't that right? I disagree respectfully, Your Honor, because certainly, we're certainly challenging the damages award. Second of all, if you look at the record, and I want to make sure I get the correct sites for you, at both page 3240 and 3244 of the record, I'd encourage you to take a look at those, where as part of that discussion with Judge Ballew, we expressly addressed the question of whether these went hand in hand, addressed the fact that they do not as part of that Rule 50 motion, as well as the fact that there's no path here, simply no path here to argue whether it's a matter of fairness or as a matter of contract law, that Zenith would be able to escape a five-year-old debt for ammunition that totaled over $3 million by making a claim for a $30,000 warranty claim and go directly to Judge Newhart to your question or comment. March 11th was when that shipment was delivered. March 21st is when Zenith admitted as part of the record it delivered it to its customers. So even if Zenith claimed there was a ten-day delay, they don't get to take a ten-day delay in March and say, I get a get-out-of-jail-free card. You're arguing, number one, you're treating my question as something that's a core and it's not, I was questioning the linkage type of thing, but the more important question is there was an argument as to who breached first and so forth, and it seemed to be unrebutted that the shipments, those first two shipments had defective product and that caused her not only expense, but caused her a delay in getting income from her customers. And that was all presented to the jury as the reason for this and that. And you made all these arguments, but my question to you, this is a core question, is do we have anything before us other than, well, you have your evidentiary rulings and your jury instructions, but the Rule 50A motion you made, you summarized it two or three times as a motion relating to damages. And the question is now are you precluded on a JNOV from arguing anything else? And I'm not sure you are, but you're welcome to address that issue. Sure, and I started to address that hopefully with Judge Berner, but the answer is we are for two reasons. First of all, certainly, as Your Honor mentioned, the JNOV did address damages and specifically addressed one of the aspects of the damages that ultimately were awarded in this case, one that Judge Ballew even noted was very close and even said this is something we may need to look at after the trial. That's why we're here, because we're looking at it after the trial, because there's no basis for those damages to have been awarded. So that's certainly one of the questions before Your Honor. Jury instructions are also here in front of Your Honor. That jury instruction conference happened after the Rule 50 motion. There were timely objections made both during the trial and after trial in those regards, so those remain as well. As I was referencing to Judge Berner, I would submit that if you take a look at pages 3240 and 3244 of the record, we also did address as part of that Rule 40 motion the arguments being made by Zenith relating to the idea that these go hand in hand, pointing out the very same testimony I shared with Your Honor where Ms. Kaya admitted that that language was not in the agreement, as well as the fact she tried to put that language in the agreement, and MKE said no. So here we have an express and unambiguous contract, so under those circumstances, I would submit that both those contract issues are still before you, but they frankly also overlap with the jury instruction issues in the first place because there was no appropriate basis to provide jury instruction 24 relating to good faith. All the acts that we're discussing here are express contractual rights. Discretion does not get involved here. There's no discretion when it comes to the fact, and we cited a number of cases for you as part of the briefing, if every express contractual right, the right to terminate, the right to say no, you missed that shipping window, became somehow a discretionary act, that would override the entire rule. So we pointed out as a matter of law there's no basis in taking a step back to the good faith and fair dealing instruction. It was incorrect, first of all, as a matter of law. The reference to dishonesty had nothing to do with this case. It was an improper instruction, as well as the final penultimate statement that the failure to act in good faith constitutes a breach of contract. Now, Zenith, to their credit in their appellate brief, does not disagree or frankly agrees that the first statement was an inappropriate or an inaccurate statement of law. Zenith takes issue with the last sentence, our challenge to the last sentence, but that's clearly not what Virginia law states. The failure to act in good faith does not constitute a breach of contract, especially when one acts pursuant to an express statutory right. In here, we had an express statutory right, I'm sorry, express contractual right, where Zenith said if we want to buy firearms for you, we're going to buy them three months or pay a down payment three months in advance. They didn't do so despite reminders to them on March the 15th, March the 27th, including reminding them we're waiting urgently for that payment, April the 4th, April the 24th, and May the 24th. All part of the record, the part of the factual record that must be considered in terms of whether a jury instruction is appropriate or not. Here it was not because the law did not allow for that. And what's left at that point, Your Honor? And I'll get to your point as well about whether this shipment delay leads to a payment delay. The shipment schedule had four shipments. The first two shipments were made, Zenith received both of them, and both of them were in Zenith's customer hands within ten days. Even if Zenith somehow argued there was a delay, you're talking at most ten days. And I'll get back to that in a second. But the second two shipments were off the table because the contract expressly said firm schedule, Ms. Kaya admitted a firm schedule, admitted that there was no right to receive anything after they missed those windows for those two payments. I'm talking about the shipment payments, not the debt payments. At that point, there's nothing else left in this contract other than the debt they still owe to MK- What was there was evidence, I thought, relating to the third shipment, or June shipment it was, and the reduction in the amount and a payment of $5,378. Slightly different. It was a $578,000 payment, Your Honor. $578,000. So what happened there is after five separate reminders that they had missed the window, and again- But that was indicated, that payment was sent as a down payment for the forthcoming shipment, right? It was indicated as a down payment for part of what was requested, the shipment. So there's two issues. That was a disputed fact. Correct. But she thought it was a legitimate down payment based on the adjustment. But quite apart from that, that's for the jury to decide. But the question is, that was made for that third shipment, and the third shipment never came. Rather, your client applied the money to the debt. They did, and Your Honor, I just- Well, I'll get back to the prior question that I was answering, because I'll address that one head on right now. That $578,000 payment was not only late, but it was incomplete. In other words, instead of being- But you accepted it. We received it, and what we said to them is that if you want to now fulfill the other orders, because they also had missed the July payment window, you need to pay us for both, and then we'll negotiate a new shipping schedule. Because at this point, the shipment schedule was out the window. If you look at that shipment schedule, it set those defined months not just arbitrarily, but for a reason, because my client, first of all, had to pay subcontractors to help create those weapons. But second of all, if you look at Attachment 2 to the contract, it has express windows in there where we have other contractual commitments to make, both the draft and otherwise, including to the Turkish Ministry of Defense. So this wasn't we hold this date open. The contract doesn't say if you pay us, we give you weapons three months later. You've thrown all kinds of claims at your opponents, and I just wonder particularly with respect to your trademark infringement claim, what was wrong with the jury's resolution of that? Because MKA, the argument was made that it knew, MKA knew of Zenith's use of the trademark at the trade show and didn't object. Do you have a problem with that? We do, Your Honor. I'll address that briefly, but then I'll turn back to the contract issue. The testimony was they did object very vociferously, but it was etched into the window and they didn't make a show of it. But even leaving that aside. Did you know of the trademark, that it was being used at the show? We did not know before. They then learned when they arrived at the trade show, and it was still being featured there in which there was a, as it was described as an altercation. But no, no one said tear that down. The bigger focus of the trademark issue, Your Honor, as I submit, is you look at the evidence that followed. A cease and desist letter that was sent that followed. And even following that cease and desist letter, Zenith continued to list on its website MKA weapons that it listed as out of stock, but said, hey, email us to be put on our wait list. So at a time where Zenith had been terminated, had been told not to use it, had received a cease and desist. Did you present all that to the jury? We did, Your Honor. That's why, with Your Honor's permission, I'm going to turn back to the contract issues, although it looks like I may be out of time. All right. If you don't want to talk about the trademark infringement and false advertising and the rest, it's up to you. I would submit on our briefs, we submitted that evidence, and what the argument I just put in front of you was the timing in terms of what happened. The shot show certainly is part of the story, but if you continue to act after a cease and desist, and list something on your website that's out of stock, and say, but nonetheless, hey, email us to be put on our wait list, they're using MKE's name and trademark to try and create confusion, and in an unfair and proper way, as well as we've identified some of the articles they were publishing on Facebook and the like in September, where they continue to draw consumer interest to them by using MKE's name, even after the year after the termination and after the cease and desist. Zenith's response to that was that the exclusivity provision did not bring an end to the relationship, and wasn't that the question before the jury? No. Zenith said it was fair use. Zenith argued it was fair use to continue to sell product that they had, but that, frankly, I guess to use my dad's old word, that dog didn't hunt, because they were listing out-of-stock weapons. You can't sell out-of-stock weapons that are out-of-stock. They were using it to drive MKE's name to their own website. With that, Your Honor, I see I am a little bit out of time. I'd like to reserve some of my rebuttal time to address further contract issues and jury instruction issues with the panel, with your permission. That sounds fine. Thank you, Your Honor.  Mr. Mayo? May it please the Court, my name is Evan Mayo. I represent Zenith Quest International, Zenith Quest Corporation, Cut Lake Aya, and Zenith Firearms, Inc. I'm going to adopt the nomenclature of the trial court and the parties and simply refer to all of those companies and their subsidiaries as Zenith, as was done throughout the briefing. I think the Court's questions to esteemed opposing counsel are the same ones that the appellees have after reading the opening brief is, you know, many of these arguments are simply repackaged jury arguments that MKE had an opportunity to make that they did quite capably make at the trial court level. So what about their argument on the erroneous instruction with respect to good faith? And, you know, it's a basic principle of contract law that an implied covenant of good faith attaches to contracts, but the implied covenant of good faith can't control the clear terms. And was that an erroneous instruction? I don't believe the instruction was. What you don't want is you don't want a contractual relationship, just you don't want to shift the focus from the contract itself and have it become some sort of mushy debate over the respective good faith of the trials. And that's the danger in these good faith instructions, is that they draw the jury's attention away from the actual text of the document. And so why was the good faith instruction here? Why was that legitimate exercise of the court's discretion? Thank you, Your Honor. I understand the question, and my answer is that the instruction could have been phrased differently, and perhaps different counsel in that position would have phrased it differently, but we're still a far sight from error or an abuse of discretion. There's no evidence at all because MKA's Was the instruction erroneous? No. We don't believe the instruction was erroneous, but in the alternative, if it were, we've argued that it was harmless. Well, tell me why you, okay, why do you think the instruction was not erroneous? Because it was an accurate statement of the background law in Virginia that the implied covenant of good faith and fair dealing is read into contracts. But Virginia doesn't allow a loose good faith instruction to just take over the trial. I agree with Your Honor with that statement of the background law, but specifically with MKA, I disagree that there's evidence in the record that that's what happened here. MKA would be in a better position if they had requested a special verdict form or some type of categorical, even a more granular liability verdict sheet, such that we could have ascertained that the jury determined that there was a breach of the implied covenant of good faith and fair dealing. That's not what happened. They simply ruled that MKA breached and that Zenith did not. And so there's not enough there to attribute harm. Was there a correction in the special verdict form, or where was the jury's attention drawn back to the terms of the agreement? I think at the end of the instruction, did the court not say that the good faith could not, in reading from the instruction, could not be implied to vary or contradict and express contractual right or obligation? Wasn't that also contained in the jury instruction? Yes, Your Honor. Excuse me. Yes, Justice Berner, that's correct. And so I think that that mitigates the concern that depends on this. Your point was that the good faith instruction had applied to discrete acts rather than to contract as a whole. I think that's the position of MKA, is that the jury must have relied on this implied duty to find breach because there's no way they could have ruled against them on the express provisions of the contract. I disagree completely with that position, having reviewed the record. I think there was a number of independent bases on which the jury might have concluded that MKA violated the express provisions of the contract. Judge Berner makes a good point, doesn't she, about the mitigating and the fact that the jury instructions ultimately mitigated it and drew the jury's attention to the essential fact. Yes, Your Honor. Your point has to be, I think, in this whole business, that we had a nine-day jury trial and we can quibble over this or we can quibble over that and there are innumerable claims on appeal, but we had a nine-day trial and sometimes you think, well, this should have been resolved. Sometimes there's always sort of a tension between whether contractual issues should be resolved by the court alone as a matter of law or whether you actually send them to trial. And that's a close call sometimes, but the district court decided to send this one to trial if there were enough issues he wanted for the jury to take a look at. And I think the best expression of your position is that all sides got to put in their evidence, they got to submit their respective positions before the jury, and that remanding this case, you know, it's the old expression that Justice Rehnquist always used, you're entitled to a fair trial, but you're not entitled to a perfect one. And sometimes the perfect is the enemy of the good. And remanding this case, are we really going to reach any better result than we have here? What would be the point? It's not going to be a better result. I mean, sometimes you just look at a case as a whole and you say, well, yes, rough justice was done. I think that's your strongest argument, if I might suggest. I wish I could have put it in those words. But I think particularly what the court had to say about not a perfect trial but a fair trial is what I was reaching for in answering Judge Niemeyer's question, which is the instruction wasn't perfect, no, but it also wasn't erroneous. There was a balancing and a tension between the part of the instruction that MKE didn't like. That's what I was trying to ask you. You say it's not perfect. I'd like to know what part you think was wrong. The court said it may not vary the terms of the contract, and the Supreme Court of Virginia has clearly said it's an implied covenant of good faith and that any contract provision performed dishonestly will violate that. I would want to clarify that I don't think the instruction was wrong. I think there were a range of acceptable instructions that could have been given on that point that wouldn't support an appeal, and the one that we have is one of them. As someone who does trial work as well, there's sometimes a decision to make about, do I want the instruction that's going to be maximally helpful to me with the jury but raises the risk of an appeal, or do I want the very safe instruction that will essentially foreclose an appeal but might be of less use to me in trying to establish liability or some quantum of damages. The trial counsel on both sides were capable here. I know that they ran that calculation, and the one that was ultimately submitted is within the range of instructions that are not erroneous and ultimately led to the jury verdict. The verdict itself, I think, is illustrative. It was related to an amount that Zenith had attached to a theory of liability based on express breach, that the 12-month delay coming from MKE saying we wouldn't be able to deliver these not for three months but for an additional nine months after that. Well, there was no question here that many of the armed shipments, a number of them were delayed. And in some cases there was no failure. There was a failure altogether to make a scheduled shipment. And the whole terms of payment in the contract were interlocking with the timeliness of the shipment and the quality of the item shipped. And so the jury heard a good deal of testimony here about the actual date and time and shipments and also whether the arms and the items shipped were defective. And that, again, they came down, they had to have come down in your favor on that. And that that was an effective counter to the fact that there had been any breach because you presented with something that the jury apparently felt was a very justified argument, or in your behalf, that the breaching party initially was your opponent. I agree with that summation, Your Honor. Plainly, a 90-day delay was workable for both sides from a delay of supply to wholesale or retail sales. Nine more months or 270 more days is just a whole different league. And I think that that must have been part of the jury's evaluation, that they planned around this three-month schedule. There was also the testimony from MKAE's own representative that a 12-month delay was not anticipated or contemplated as part of the contract, which would tend to cut against Mr. Voskoski's argument that we need to evaluate the sort of strict liability standard of breach under the agreement. I will say I'm struggling to understand the counterclaim damages award. Even if MKAE breached the contract first, how does that breach then wipe away the $4 million in debt that Zenith owed to MKAE for the unpaid invoices? Can you walk me through the evidence that supports the damage award on the counterclaim? Yes, Your Honor. So there was evidence on the lost profits relating to the shipments that weren't made. I think there was a shipment of 1,700 guns or firearms that were supposed to be delivered, and in total 3,600. In closing, Zenith's counsel argued that there were lost profits attributable to those 3,600 firearms that were approximated at $1.5 million was the number that was requested there. There was also the loss of the 40 percent down payment, which was improperly, in Zenith's view, applied to the outstanding debt as opposed to being treated as a down payment on those future firearms deliveries. I believe there was also evidence. How much was that down payment? It was $578,000. So the components of the damage award here that you asked for were the lost profits and the June shipment down payment, the cost of the delayed firearms part, and the cost of warranty work and processing for March and May. I think you were right to say that these different components of the damage award were supported by, in some cases, warranty reports. And in other cases, a witness testimony, and you had cost spreadsheets. So you had these different components of the damage award, and there were different kinds of evidence that supported each one of them. In some cases, there were warranties. In other cases, you had cost spreadsheets, and in other cases, you had witness testimonies. But there was a foundation for them. As I just come back to the question, I don't know what we would accomplish by sending this back. Just as a practical matter, I can quibble around the edges. I could. I could. But taking the thing as a whole, what good could we do? You know, we sort of leave very well done alone. This is a very, you know, you can't read this transcript without recognizing that this is a very fine trial judge. He's really good. I haven't had the pleasure of practicing before Judge Ballou before, but I've read his opinions, and certainly the one he did in this case we thought was well-reasoned. We're not vouching for him, but we're saying that the record reflects, I'm saying that the record reflects a trial judge who's really good at his job. I agree with the court's assessment and would state also, we haven't talked about the waiver issue, but Judge Niemeyer did bring it up, and I think it's important to evaluate. To me, there's really two waiver issues in the case. Oh, I'm so sorry. Judge Berner, I meant to also, in response to your question, I had one more item I wanted to mention, which was that there was evidence of offset by the foreclosure of the property in Turkey. That was another category of damages that I think would be relevant to your question about how the debt was wiped out, the $2.5 million asset. That was security for the debt? I'm sorry. As I stand here today, I cannot recall whether that was collateralized, but I want to be as helpful to the court as I can. But they used that, they used that, the proceeds of that sale to offset the debt. I believe that's correct. Yeah. And so Judge Ballou's opinion here is comprehensive. It mustered the evidence very effectively. The parties did the same in the briefing. I don't really think, I would submit respectfully that it may not be so helpful for me to survey those things. But on the issue of waiver, I think there are two waiver issues. And first is, did MKE waive the right to have the court evaluate the JMOB motion by failing to include it in the opening brief? In the reply brief, MKE says, well, you used a criminal case here, so it's not relevant. One thing you sort of get concerned about, and this was a Turkish arms manufacturer, and you have a foreign party and you want to make extra sure that the foreign party receives a fair shake in American courts, just as we hope that an American company would receive a fair shake in Turkish courts. And so, you know, I just allay any concern, if you can, on my part, that the jury verdict here was not the product of prejudice against a foreign arms manufacturer. Because it's really important that American courts treat foreign companies fairly. Now, am I right to be concerned here about what animated the jury verdict? It's a two-point no, Your Honor. Let me tell you the reason why I say no. First, there's none of the what I'll call markers of a runaway jury or runaway verdict here. But there were no remarks in closing argument or elsewhere that tried to signal to the jury that this is another country. I mean, there was no signaling of that kind, or was there? I have to admit, Your Honor, I had not scanned the record specifically for that concern. But I can submit that the Kayas, or Mr. Kaya specifically, is an immigrant from Turkey. The majority of the employees were Turkish. That's how the relationship, the supply relationship arose. And I would think that that would be a mitigating factor there. The concern might be more acute if we had a company staffed by American citizens, founded by non-naturalized American citizens versus a foreign arms manufacturer. But someone who was, for example, prejudiced against Turkey might have reasonably applied that prejudice against both sides, given the origination of the Zenith companies here. Did I answer the court's question? Yes. Thank you. Thank you. And so in summation, I would submit that I think that the issue on JMOV is because there was an independent and sufficient ground for the court's judgment, which was that there was a mismatch between 50A and 50B, the rule 50A and 50B motions submitted by MKE, and that wasn't appealed. We're looking now only at cases of manifest injustice, miscarriage of justice, which is a fairly daunting standard, particularly where, as here the court has noted, there's substantial evidence in the record. Respectfully, I think a number of the arguments in the briefing from MKE are simply asking the court to reweigh evidence or to evaluate the strength of evidence credibility, which wouldn't be appropriate under the standard that should be applied. All right. Thank you. If my colleagues have some questions, I'll ask you. Judge Bernhard, do you have any questions? Judge Niemeyer, do you have any questions? Thank you very much. We don't have a question. Move that back down. Mr. Mayo is a bit taller than me. Your Honors. Let me just ask you before you get started. You raised a lot of issues on appeal, and obviously you wanted to have everything preserved. But if you were to pick the strongest argument to give you relief, what would that be? It would be two, Your Honor. It would be the jury instruction and the rule 50 relating to the damages, Your Honor. The damages aspect of that would be the two that I'm most focused on. So the setting aside the jury instruction, I must say I'm not sure that gets you too far because of the cautions that the court gave and the context in which it was given. It seems to me it's consistent with Virginia Supreme Court law, and you can show me a case that it isn't, but the Supreme Court has explicitly approved it in connection with explicit contract terms. But the other issue is basically is your focus is basically the damages were not supported by evidence. Is that the main? Correct, by the contract or by the evidence. And, Your Honor, those overlap to some degree, and it kind of gets into the three points that I was going to seek to make during my rebuttal period. The first one is, look, close is not a fair trial. And just picking up on some of Judge Wilkinson's questions, there were other elements of well. You know, there was elements where during closing and during the trial itself, there were reported references to this on-trap judgment. Judge Ballew had limited that just to the fact of it and how much Zenith had paid, which was about $3.5 million. Nonetheless, Zenith repeatedly published a $38 million number, again to evoke sympathy. Mr. Kaya, who counsel just mentioned, one of the arguments that Judge Ballew threw out was the novation relating to a 2017 claim. And Mr. Kaya was allowed to testify over our objection that he had sold his house or been forced to sell his house to make a payment that MKE was found to have properly received as a novation. So there are a number of other errors. We've raised those in our brief. I think those are all tied into these overall issues. But all three of those jury instruction issues are paramount. They gave the jury a path to ignore the contract, to rely upon sympathy, again, against a foreign defendant. And my client does feel strongly on this. It was a nine-day trial because all my witnesses had to be translated. That led to length. That led to, you know, challenges in that regard. But at the end of the day, we are a country and a state guided by laws. And the law here was not followed. I agree. I like Judge Ballew. What law was not followed? The law was not followed in the giving of the good faith instruction, the prevention. Tell me, what do you have to point to it? I mean, I've read the instruction. I've read the Supreme Court. I haven't read the Supreme Court cases. I've read summaries of them.  And I just, I'm trying to find out what you think was erroneous about it. The final sentence, the penultimate sentence given to the jury was the failure to act in good faith constitutes a breach of contract. That is not a proper statement of law when one considers everything here was an express contractual right. And we've cited to you the ward's equipment. But what about Judge Berner's point that the instruction was given to, or the jury was cautioned, that good faith would not displace the contractual terms? She made that point, and why isn't that sufficient cure? Because it's followed by the statement, the failure to act in good faith constitutes a breach of contract. That is not correct as a matter of law. It's also not supportable by the facts here where all the acts taken were done with express contractual rights. We've cited the ward's equipment case, the Virginia Supreme Court case, as well as various others, like Buffalo, Cole, and Land and Marine, that, you know, trying to turn an express contractual right into a discretionary right. Let me just read you something from the, from the, this is from Virginia Supreme Court. It says that a party could breach the obligation of good faith by exercising express contractual rights, express contractual rights dishonestly. And another court said that the implied covenant could be violated if a party performed existing contract terms dishonestly. These are both reiterations of the implied covenant of good faith. So, and the court did warn that it doesn't displace, doesn't displace the contract terms. The idea is that the contract terms themselves were performed in bad faith or dishonestly. And I'm not sure that this wasn't correct. I, that's why I wanted you to point out, is there some case law that suggests what you, some Virginia case that tells you, tells them that was a wrong instruction? The answer, Your Honor, is yes. And I believe we cited those in the brief. Again, I'd refer you to the ward's equipment case. Okay, I will go look at that. Certainly. And I'd refer to the cases in our brief. Okay. Just very briefly in that regard, Your Honor, picking up on Judge Berner's points as well. The $578,000, saying that a $30,000 warranty claim in which they had those weapons into their customers' hands ten days later, somehow allows them to void a four-year-old, $4 million payment relating to ammunition, that is also why we challenge these instructions. Because these instructions, the prevention of performance instruction, they had those weapons. They shipped those weapons. Saying that some of them had some abrasions or a loose handle or something like that, even if that's true. Well, she made a trip to Turkey, didn't she? She did. I mean, it got to the point where she had to travel all the way across to Turkey to consult on the manufacturing process and to inform and instruct it. This was more serious than a scratch. The evidence shows that prior to that, their person there that did the inspection, Ali Kaya, not a relation but a similar surname, Ali Kaya reviewed and approved those weapons for the May shipment. So the fact saying in one shipment of weapons you had approximately $30,000 worth of claims, even if that's the sum total, using that to void or try and void a four-year-old, $4 million. The second shipment also had problems, didn't it? The second shipment, there are allegations about $5,000 worth of problems. Again, in customers' hands and Your Honor picking up on that. After both those shipments were received and then sent to customers and accepted, Zenith made the debt payments in May and June. They don't get to keep a get out of jail free card to come back in July and say, well, now we want to complain about that March shipment that we sent out to our customers three months ago. Ten days after we received it and used that to extend the payment, especially in a situation, again, four-year-old debt dealing with a different installment subject, as well- What was the reference to the property sold in Turkey? How much was that? That's not in the record, Your Honor, but I'm happy to address that if you'd like me to address it. It's outside the record. No, that's all right. There was some reference that that was securing part of the debt. There was a parallel proceeding in Turkey. Yeah. There was a foreclosure of that. Yeah. That is not part of the record. There was no evidence put on. Okay. But I'm happy to submit something in supplemental briefing just so Your Honor is comfortable. No one's looking to double-dip here. But just the point I was trying to make, Your Honor, is when you look at this, at this point there's nothing left with this contract. They received the first two shipments, even though they paid them late. Now, again- Well, as you make this argument, what point are you trying to make to me? The point is at this point you raised the question and Judge Wilkinson raised the question, well, don't they get some delay in the debt? And the answer is no. No, no. The question is whether the jury had sufficient evidence to reach the conclusion it did. They did not. And that's the point I'm trying to make. And that's your argument that they didn't. They did not. And in part they were allowed to go down a wayward path based on erroneous jury instructions with this prevention of performance, where at this point there was nothing left under this contract. Zenith had paid for two shipments. They received those two shipments. They sent them to their customers. The other two customers were set on set specific dates. They don't just say come back later and buy them later. Thank you, Your Honor. I see I'm well over my time. I'm going to quit talking. We thank you. Thank you, Your Honor. And we appreciate it. And we will come down and greet you both. Thanks to you both. And then we'll move right directly into our final case. And may we go over and say just greet Judge Berner as well. I see she's around, so.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Nicole G. Berner